

# NUMBER 13-17-00378-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

## IN RE COMMITMENT OF DONALD WAYNE HULL

---

### On appeal from the 252nd District Court
### of Jefferson County, Texas.

---

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Hinojosa**
**Memorandum Opinion by Justice Hinojosa**

Appellant Donald Wayne Hull appeals a final judgment following a jury trial ordering his indefinite civil commitment as a sexually violent predator.[1]  *See* TEX. HEALTH & SAFETY CODE ANN. §§ 841.001–.151 (SVP Act).   In four issues, which we have reorganized, Hull contends that the evidence was legally and factually insufficient (issues

---

[1] This case is before this Court on transfer from the Ninth Court of Appeals in Beaumont pursuant to a docket-equalization order issued by the Supreme Court of Texas.  *See* TEX. GOV'T CODE ANN. § 73.001.

one and two), and the trial court abused its discretion in allowing the State's expert witness to discuss as "basis" evidence that Hull committed a sexual assault as a juvenile and in excluding evidence of his parole conditions (issues three and four).

We conclude that the trial court abused its discretion in permitting the introduction of unreliable evidence to the jury through the State's expert and that such error was harmful. Therefore, we must reverse the trial court's judgment and remand the case for a new trial on the State's petition to commit Hull as a sexually violent predator.

## I. SEXUALLY VIOLENT PREDATOR LAWS

Our analysis is informed by the history and development of sexually violent predator statutes in Texas and other states. The Texas Legislature enacted the SVP Act based on legislative findings that "a small but extremely dangerous group of sexually violent predators exists and that those predators have a behavioral abnormality that is not amenable to traditional mental illness treatment modalities and that makes the predators likely to engage in repeated predatory acts of sexual violence." TEX. HEALTH & SAFETY CODE ANN. § 841.001. A survey of recent Texas cases illustrates the Act's exclusiveness. *See In re Commitment of Williams*, 539 S.W.3d 429, 433–34, 440 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (offender had a "very-well-ingrained pedophilia" including nine sex-related convictions and sexual offenses against multiple victims while employed as a teacher at a parochial school); *In re Commitment of Gomez*, 535 S.W.3d 917, 919 (Tex. App.—Corpus Christi–Edinburg 2017, no pet.) (offender was convicted of five counts of aggravated sexual assault of his girlfriend's twelve-year-old sister and his probation was revoked because of sexual acts committed with his minor daughters, aged one and two, on "several occasions"); *see In re Commitment of Cavazos*, No. 05-18-00894-CV, 2019

2

WL 2353446, at *5 (Tex. App.—Dallas June 4, 2019, pet. filed) (mem. op.) (noting decades-long history of sexual assault of minor males and admissions concerning dozens of other child victims); *In re Commitment of Stonecipher*, No. 14-18-00143-CV, 2019 WL 1119780, at *6 (Tex. App.—Houston [14th Dist.] Mar. 12, 2019, no pet.) (mem. op.) (offender pleaded guilty to sexually assaulting five young children and admitted that he victimized three other children).

Texas's statute is modeled after those adopted in Washington in 1990 and later in Kansas, as evaluated in the *Hendricks* decision of the United States Supreme Court. *In re Commitment of Stoddard*, No. 02-17-00364-CV, 2019 WL 2292981, at *2 (Tex. App.—Fort Worth May 30, 2019, no pet. h.) (mem. op. on reh'g); *see Kansas v. Hendricks,* 521 U.S. 346 (1997). In 1990, Washington passed the first sexually violent predator civil commitment law in response to the case of Earl Kenneth Shriner. *Stoddard*, 2019 WL 2292981, at *2 (citing Roxanna Lieb, et al., *Sexual Predators and Social Policy*, 23 CRIME & JUST. 43, 55 (1998)). Shriner was a mentally disabled offender with a decades long history of killing, sexual assault, and kidnapping. *Id*. Washington prison officials were unsuccessful in having Shriner civilly committed after his prison sentence, despite discovering Shriner's plans to torture children in the future. *Id*. Two years after his release, Shriner kidnapped, raped, strangled, and sexually mutilated a seven-year-old boy. *Id*. In response to public outcry, Washington passed its civil commitment statute intended to address a "small but exceedingly dangerous" group of sexually violent predators that were not amenable to already available means for involuntary commitment. *Id*. (quoting WASH. REV. CODE ANN. § 71.09.010).

3

Kansas later passed its own sexually violent predator statute, which it modeled after Washington's statute. *Id*. Leroy Hendricks, the first person to be committed under the statute, challenged its constitutionality. *See Hendricks*, 521 U.S. 346. In its decision upholding the statute, the United States Supreme Court described Hendricks's "chilling history" of repeated child sexual molestation and abuse, which spanned over thirty years and included several child victims. *Id*. at 354. Hendricks admitted in his civil commitment proceeding that "he had repeatedly abused children whenever he was not confined" and that "when he 'get[s] stressed out,' he 'can't control the urge' to molest children." *Id*. at 355. Hendricks agreed that he suffered from a condition that could not be treated. *Id*.

In upholding Kansas's commitment statute, the Court underscored the constitutional importance of distinguishing a dangerous sexual offender subject to civil commitment from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings. *Id*. at 360. In a later decision, the Court stressed that due process requires "proof of serious difficulty in controlling behavior." *Kansas v. Crane*, 534 U.S. 407, 413 (2002). The Court explained that this proof "must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case." *Id*.

As explained by our sister court, our review in SVP commitment cases must necessarily be informed by these constitutional restrictions:

> That Chapter 841 applies only to a member of a small group of extremely dangerous sex offenders is a necessary component of Chapter 841 precisely because it provides the constitutional mooring without which Chapter 841 might not withstand a constitutional challenge. In considering the constitutionality of the current generation of sexually violent predator civil commitment laws, the United States Supreme Court upheld the civil

4

> restraint on liberty precisely because the statute in question was limited to "narrow circumstances" and "a limited subclass of dangerous persons." *Hendricks*, 521 U.S. at 357 . . . . Indeed, without such limitation, a serious question would arise whether Chapter 841 could pass constitutional muster.

*Stoddard*, 2019 WL 2292981, at *12. Failing to consider these restrictions "risks ripping Chapter 841 from its constitutional foundation, thus opening the door to civil commitments of sex offenders based solely on their predicate sex offenses." *Id*.

To warrant Hull's civil commitment as a sexually violent predator, and to distinguish Hull from the "dangerous but typical recidivist convicted in an ordinary criminal case," *Crane*, 534 U.S. at 413, the State was required to prove two prongs beyond a reasonable doubt: (1) that Hull is a "repeat sexually violent offender" and (2) that Hull suffers from a "behavioral abnormality that makes [him] likely to engage in a predatory act of sexual violence." TEX. HEALTH & SAFETY CODE ANN. §§ 841.003(a), 841.062(a).

## II.     BACKGROUND

### A.     Prior Convictions and Imprisonment

The State presented evidence that Hull pleaded guilty and was convicted of the following sexually violent offenses: (1) a 1977 conviction for aggravated kidnapping with the intent to violate and abuse the victim sexually, *see* TEX. PENAL CODE ANN. § 20.04; and (2) two 2001 convictions for indecency with a child. *See id*. § 21.11. On the basis of these convictions, the trial court granted the State a directed verdict that Hull is a repeat sexually violent offender. *See* TEX. HEALTH & SAFETY CODE ANN. § 841.003(b).

Hull was released from prison in 1984 after serving seven years for the first conviction. He was arrested fifteen years later, when he committed the offenses forming the basis for his 2001 convictions. Hull spent sixteen years in prison for the 2001 convictions when the parole panel ordered his release at the age of sixty. All told, Hull

5

has served twenty-three years in prison for his crimes. In ordering Hull's release, the parole panel necessarily determined that Hull "is able and willing to fulfill the obligations of a law-abiding citizen" and that his release is in the "best interest of society." *See* TEX. GOV'T CODE ANN. § 508.141(e)(2), (f). Anticipating Hull's release, the State's Special Prosecution Unit—Civil Division filed a petition seeking to commit Hull indefinitely as a sexually violent predator.

## B. Expert Testimony

The State and Hull both presented expert opinion testimony regarding whether Hull suffered from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. The State's expert, Darrel B. Turner, Ph.D., concluded that Hull suffered from such a condition. Hull's expert, Marisa R. Mauro, Psy.D., concluded otherwise.

A critical difference in their testimony was the extent to which Drs. Turner and Mauro relied on a prisoner "travel card" notation indicating that Hull committed a sexual assault as a juvenile. Dr. Mauro described the travel card as a summary of an inmate's criminal history written by a prison employee. Without any available juvenile records to confirm the offense, Dr. Mauro determined that the information was unreliable and placed little emphasis on the allegation. On the other hand, Dr. Turner believed that the offense was "quite relevant" to his analysis and mentioned it extensively throughout his testimony. The trial court overruled Hull's objections to testimony referencing the travel card evidence.

### 1. Dr. Turner

Dr. Turner, a clinical psychologist, was retained by the Texas Department of

6

Criminal Justice to assess whether Hull suffered from a behavioral abnormality as that term is defined in the SVP Act. Dr. Turner reviewed Hull's conviction records, offense reports, investigative narratives, deposition testimony, and inmate records. He also interviewed Hull for approximately two hours. Dr. Turner concluded that Hull suffered from a behavioral abnormality.

Dr. Turner testified regarding the details of Hull's prior sexual misconduct which he gleaned from his interview with Hull and his review of Hull's criminal and prison records. He first described Hull having committed a sexual offense at the age of fifteen.[2] Dr. Turner referenced the alleged juvenile offense throughout his testimony as indicative of Hull's lifelong pattern of committing sexual offenses. Dr. Turner noted that the offense was "quite relevant" to his risk assessment, explaining: "So, what we know is that at an early age he was willing to violate someone else to satisfy his own sexual urges. He was punished for that and then went on to re-offend, actually multiple times."

Dr. Turner then noted that Hull committed an aggravated kidnapping at the age of twenty, for which he was convicted and imprisoned. During his interview with Dr. Turner, Hull stated that he was driving a vehicle when his passenger jumped out of the car, grabbed a girl off her bicycle, and pulled her into the backseat. Hull claimed he became "scared," drove off, and told the passenger to stop. Hull claimed that the victim testified on his behalf.

According to Dr. Turner, Hull's version of the events was inconsistent with what was detailed in Hull's criminal records. Those records indicated that Hull devised a plan with his co-defendant to abduct a girl from Lamar University in Beaumont, Texas. Hull,

---

[2] We discuss Dr. Turner's testimony regarding the juvenile offense and Hull's objection thereto in greater detail below as a part of our analysis of the trial court's evidentiary ruling.

7

who was driving, stopped the vehicle, while his co-defendant grabbed a girl from her bicycle and forced her into the backseat. Hull drove away, but the victim ultimately escaped. According to Dr. Turner, Hull's co-defendant indicated that "their initial intent was to take [the victim] to a secluded area and take turns raping her." Dr. Turner believed that Hull's minimization of his involvement indicated a lack of remorse for his actions and empathy for the victim. He also believed that by abducting a stranger, Hull showed a significantly higher risk "to re-offend than people who offend against people that they do know or even within their family." Dr. Turner found Hull's commission of the offense in the daylight in a residential area to be evidence of Hull's "level of antisociality and impulsivity and behavioral control to do something like that and run a higher risk of getting caught. . . ."

Dr. Turner testified that while Hull was in prison for the aggravated kidnapping conviction, he received four disciplinary infractions for sexual conduct with other inmates. First, according to Dr. Turner, Hull received a disciplinary infraction for threatening an inmate who refused his sexual advances. Hull received a second disciplinary infraction for engaging in a consensual sexual act with another inmate. His third infraction resulted from his soliciting sex from another inmate in exchange for protection. The fourth incident involved Hull having consensual sex with other inmates.

Dr. Turner then discussed the details of the offenses involving the sexual abuse of two minor children which resulted in Hull's 2001 convictions. Hull committed the offenses fifteen years after Hull's release from prison. According to Dr. Turner, a twelve-year-old child claimed Hull touched her vagina underneath her underwear, and she reported the incident immediately. After the twelve-year-old reported that incident, another child

8

reported that Hull had been sexually abusing her by "rubbing her breast, rubbing her vagina, exposing his penis, asking her if she liked it—as well as offering her money or ice cream or pickles and things like that."

Dr. Turner stated that Hull denied any criminal conduct, instead claiming that "he slipped on some water . . . .  he reached out to stop himself; and that's when he accidently touched her vagina."  Hull "denied offending against them, and he said that they were very starved for affection from their caregiver; so, he would hug them a lot . . . Dr. Turner found that Hull's denials were important because it impacts Hull's ability to progress in treatment and shows a lack of remorse.

Dr. Turner stated that after Hull was charged with the offenses against the two children, Hull called the victims' families and threatened to kill them for reporting the offenses.  Dr. Turner explained this showed Hull's "antisociality, which is one of the two big risk factors."

Dr. Turner also considered Hull's history of substance abuse in his assessment, testifying that although Hull admitted to using "street drugs" such as "speed," Quaaludes, and "Mollies" in the seventies, which in Dr. Turner's opinion was not "that remarkable of a history," "there was evidence in the records that he had also previously admitted to . . . use of cocaine," and Hull's drug use "then started to look problematic" to Dr. Turner "because it was becoming more severe and prevalent and because he was dishonest about it at some point."  Dr. Turner explained that Hull's substance abuse was indicative of antisociality.

Dr. Turner opined that Hull was a sexual deviant which he described as a risk factor that "refers to some kind of [sexual] interest that is beyond or outside of two . . . consenting

9

adults." Dr. Turner also believed that Hull met the criteria for pedophilic disorder because he sexually abused a child younger than thirteen years of age for a period of at least six months. In addition, Dr. Turner diagnosed Hull with antisocial personality disorder, which he stated is a lifelong condition.

Dr. Turner explained the risk associated with an individual who has an antisocial personality disorder and is also a sexual deviant:

> What we have is, when the two big risk factors exist together, when we have a sexually deviant interest or interests, in this case, and we have that fuel of that antisocial personality that allows a person to act on it and we see that they have repeatedly done that across decades after being punished several times, that's when those two really, really increase a person's risk level.

In his evaluation, Dr. Turner used the "psychopathy checklist—revised" (PCL-R), "an instrument that's designed to measure to what degree a person is a psychopath." Dr. Turner scored Hull "on 20 items that have been shown through research to be present in people with this personality construct." He explained that the PCL-R was not designed to predict whether a person would re-offend, but it is a solid risk assessment tool. Dr. Turner's score for Hull was twenty-nine, which is beyond the cutoff for a psychopath finding of twenty-five.

Dr. Turner also used a Static-99R instrument, which he described as a tool to score various risk factors. He scored Hull a 2 on this instrument, indicating that Hull presented an average risk to reoffend when compared to other sex offenders.

### 2. Dr. Mauro

Dr. Mauro, a psychologist, was retained by the Texas State Counsel for Offenders Office to assess whether Hull suffered from a behavioral abnormality. Dr. Mauro's assessment was informed by the statutory definition of a behavioral abnormality as well

10

as the Texas Legislature's findings that the statute was limited to a small but extremely dangerous group of sexually violent predators. Dr. Mauro explained that she uses a "clinically adjusted actuarial approach" in her assessments. This approach involves scoring an individual using actuarial instruments and then looking at other clinical variables that have been associated with a risk to reoffend. Prior to interviewing Hull, Dr. Mauro reviewed his criminal and prison records. Dr. Mauro testified that there were no juvenile records provided in the case. Further, she did not believe the travel card[3] indicating a juvenile sexual assault was a reliable source of information because she did not know who prepared it or on what information the person relied. Ultimately, Dr. Mauro concluded that Hull did not suffer from a behavioral abnormality.

Dr. Mauro stated that Hull's version of his conduct underlying the 2001 convictions differed significantly from the victims' allegations. However, she stated that Hull's account of the 1977 kidnapping conviction was fairly consistent with the details provided by the victim in his co-defendant's trial. Dr. Mauro cited studies which concluded that denial of committing an offense was not statistically related to recidivism. She also stated that minimization of an actor's role in an offense is not a risk factor for sexual recidivism.

Dr. Mauro noted that Hull received disciplinary infractions for sexual behavior when he was first imprisoned in his twenties, but that none were assaultive in nature. She stated that Hull received no disciplinary infractions for sexual behavior during his second period of incarceration which covered sixteen to seventeen years beginning when Hull was in his forties. Dr. Mauro believed that this contrast was an indication of a significantly improved behavioral pattern.

---

[3] She described the document as a summary of an inmate's criminal history written by a prison employee.

11

Dr. Mauro completed the following assessment instruments: Static-99R, 2002R, and the PCL-R. She attributed a score of 23 for Hull on the PCL-R which falls within the range designated as "mixed psychopathic traits." Dr. Mauro explained that the score indicated that Hull has more traits than someone who does not have psychopathy but not as many traits as someone who does have psychopathy. Dr. Mauro believed Dr. Turner's score of 29 was too high, explaining:

> [T]he PCL-R is a measure of someone's functioning on these items throughout their life-span. Mr. Hull, from his release in prison in 1986 to when he committed these offenses in '99, really had a fairly unremarkable life. He had a—he had a long-term relationship with a woman that spanned about a 20-year period. He held jobs, and he was out there functioning in the community. And then when he committed these offenses and he came back to prison, he's had a very unremarkable stay in prison. He does have minor cases. He only has one major case. Nothing—no really history of assault or violence or anything like that. So, when we look at that span, his behavior is just not associated with somebody that would have that high of a psychopathy score. Traditionally, when you would see something that high, you would see a person of Mr. Hull's age that, across his lifetime, has shown, you know, some very poor behavior, very violent, no empathy, no long-term relationships, just lots and lots of adult charges, criminal history, those type of things.

Dr. Mauro also used a Static-99R instrument, which she described as an actuarial tool used to predict someone's risk of sexual recidivism. The third instrument Dr. Mauro used was the Static-2002R, which is similar to the Static-99R but includes some additional questions. Dr. Mauro's score for Hull on both instruments indicated that Hull's risk to re-offend was similar to that of other sex offenders.

Dr. Mauro disagreed with Dr. Turner's diagnoses of pedophilic and antisociality disorders. She explained that there was not enough information to suggest that Hull had a sexual preference for prepubescent children. Dr. Turner also believed that Hull did not exhibit a persistent pattern of antisocial behavior throughout his life, citing long periods

12

when he was in a stable relationship, maintained employment, and did not commit any major offenses.

## C. Hull's Testimony

Hull testified concerning the events forming the basis of his 1977 conviction. He claimed that he stopped his vehicle at a red light when his passenger, "out of a spur of the moment, opened the car door, reach out and grabbed [the victim.]" Hull stated that he reached back while he was driving to help push the victim out of the car, while his passenger was attempting to pull off her pants. He stated that the victim was able to free herself and exit the vehicle. Hull denied committing any sexual misconduct while in prison following his 1977 conviction.

Hull denied committing the offenses forming the basis of his 2001 convictions. Hull claimed that he was a grandfather figure to the victims. He maintained that while one of the victims was visiting his home, Hull slipped on water and grabbed the child's waist to maintain his balance. He denied intentionally touching her vagina. Hull denied ever being alone with the second victim or having touched her inappropriately.

## D. Verdict

The trial court granted a directed verdict that Hull was a repeat sexually violent offender. The jury found beyond a reasonable doubt that Hull is a sexually violent predator, and the trial court entered a final judgment on the jury's verdict. This appeal followed.

### III. LEGAL SUFFICIENCY

We first address Hull's legal sufficiency challenge because, if sustained, it would afford him the greatest relief. *See Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995

13

S.W.2d 675, 677 (Tex. 1999) (per curiam) ("Generally, when a party presents multiple grounds for reversal of a judgment on appeal, the appellate court should first address those points that would afford the party the greatest relief."). Hull argues that "[t]he evidence is legally insufficient to support a beyond-a-reasonable doubt finding that [he] has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence."

## A.    Standard of Review and Applicable Law

Although the commitment of a person as a sexually violent predator is a civil proceeding, the SVP Act requires the State to prove beyond a reasonable doubt that a person is a sexually violent predator. *In re Commitment of Harris*, 541 S.W.3d at 325 (citing *In re Commitment of Fisher*, 164 S.W.3d 637, 645–53 (Tex. 2005)). Thus, we review the legal sufficiency of the evidence using the appellate standard of review for criminal cases. *Id*. (citing *In re Commitment of Dever*, 521 S.W.3d 84, 86 (Tex. App.—Fort Worth 2017, no pet.); *In re Commitment of Mullens*, 92 S.W.3d 881, 885 (Tex. App.—Beaumont 2002, pet. denied)). We consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found beyond a reasonable doubt the elements required for commitment. *Mullens*, 92 S.W.3d at 885. The jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Id*. at 887.

As stated above, the State was required to prove beyond a reasonable doubt that Hull suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. TEX. HEALTH & SAFETY CODE ANN. § 841.003(a). A "behavioral abnormality" is "a congenital or acquired condition that, by affecting a person's emotional

14

or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id*. § 841.002(2).

## B.     Analysis

Dr. Turner testified that after examining Hull's records, interviewing Hull, and performing tests, and based on his experience, training, and the methodology used, he believed Hull suffers from a behavioral abnormality that predisposes him to engage in predatory acts of sexual violence.  Specifically, Dr. Turner stated that his role was "to apply principles and research and what we know about psychology to the law and use the definitions in the law to come to an opinion as to whether or not I feel that Mr. Hull has a behavioral abnormality."  Dr. Turner explained that a behavioral abnormality is not a mental health term but is "a legal term just like insane is a legal term but it has mental health connotation," and the definition of behavioral abnormality is not found in any medical books and instead is found in the Texas Health and Safety Code Chapter 841. Dr. Turner stated that a congenital or acquired condition is "either something that you are born with or it's something that you obtain along the course of your life" that does not require a specific medical diagnosis.  Dr. Turner explained that the phrase in the statute, "predispose the person to commit predatory acts of sexual violence" means that the individual has "some kind of condition that impairs [his] ability to control [himself] and makes [the person] likely to commit another sex offense."  And, here, Dr. Turner concluded that Hull is a psychopath, has an antisocial behavior disorder, suffers from sexual deviancy, and has pedophilic disorder, which according to Dr. Turner, means that

15

Hull suffers from a behavioral abnormality that makes him likely to engage in predatory acts of sexual violence. *See id*. § 841.002(2).

Dr. Mauro disagreed with Dr. Turner's assessment in several key respects, and she reached a contrary conclusion concerning whether Hull suffered from a behavioral abnormality. However, it was within the jury's province to determine which expert's testimony to credit, and in conducting a legal sufficiency review we must view the evidence and inferences in the light most favorable to the jury's findings. *See Gunn v. McCoy*, 554 S.W.3d 645, 664–65 (Tex. 2018); *Morrell v. Finke*, 184 S.W.3d 257, 282 (Tex. App.—Fort Worth 2005, pet. denied) ("In a battle of competing experts, it is the sole obligation of the jury to determine the credibility of the witnesses and to weigh their testimony.").

Dr. Turner identified and discussed the risk factors that he relied upon to form his opinion. On the basis of his expert testimony, we conclude a rational trier of fact could have found beyond a reasonable doubt that Hull suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence.[4] *See McCoy*, 554 S.W.3d at 664–65; *Mullens*, 92 S.W.3d at 885. Accordingly, we conclude the evidence is legally sufficient. We overrule Hull's first issue.

---

[4] In reaching this conclusion, we necessarily reject Hull's contention that Dr. Turner's opinion testimony is conclusory and unreliable. *See In re Commitment of Day*, 342 S.W.3d 193, 206 (Tex. App.—Beaumont 2011, pet. denied) (concluding that expert's opinion was not the mere *ipse dixit* of a credentialed witness where the expert presented a reasoned judgment based upon established research and techniques for his profession); *see also In re Commitment of Stoddard*, No. 02-17-00364-CV, 2019 WL 2292981, at *10 (Tex. App.—Fort Worth May 30, 2019, no pet. h.) (concluding that expert testimony was not conclusory or speculative where the expert provided evidence-based support for his opinion); *In re Commitment of Cox*, No. 09-11-00100-CV, 2012 WL 759049, at *7 (Tex. App.—Beaumont Mar. 8, 2012, pet. denied) (mem. op.) (holding that both experts presented evidenced based support for their opinions).

## IV.   EVIDENTIARY RULING

Hull raises three additional issues which, if sustained, would entitle him to a new trial.  Because his third issue is dispositive, we address it next.   *See* TEX. R. APP. P. 47.1.  Hull contends the trial court abused its discretion in overruling its objections to Dr. Turner's testimony regarding a Texas Department of Criminal Justice travel card which, according to Dr. Turner, showed that Hull committed a sexual assault when he was a juvenile.  Specifically, Hull argues that the travel card was unreliable and thus inadmissible and that any probative value it had was outweighed by its prejudicial effect.  *See* TEX. R. EVID. 703, 705(a), (d).  We conclude that the trial court's evidentiary ruling was both erroneous and harmful.

## A.     Standard of Review and Applicable Law

We review the trial court's admission or exclusion of evidence for an abuse of discretion.  *U-Haul Int'l., Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012).  A trial court abuses its discretion when it fails to follow guiding rules and principles.  *Id*.  Reversal for erroneously admitted evidence is warranted only if the error probably resulted in the rendition of an improper judgment.  *See* TEX. R. APP. P. 44.1; *Waldrip*, 380 S.W.3d at 136.  While recognizing the "impossibility of prescribing a specific test" for harmless-error review, the Texas Supreme Court requires that we evaluate the entire case from voir dire to closing argument, considering the evidence as a whole, the strength or weakness of the case, and the verdict.  *Waldrip*, 380 S.W.3d at 136 (quoting *McCraw v. Maris*, 828 S.W.2d 756, 757 (Tex. 1992)).  In doing so, we look to the role the evidence played in the context of the trial and the efforts made by counsel to emphasize the erroneously admitted evidence, as well as whether contrary evidence existed that the improperly admitted

17

evidence was calculated to overcome. *Id*.

Under Texas Rule of Evidence 705, an expert may disclose the underlying facts or data upon which the expert bases his or her opinion. *In re Commitment of Talley*, 522 S.W.3d 742, 748 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (citing TEX. R. EVID. 705; *In re Commitment of Alvarado*, No. 09-13-00217-CV, 2014 WL 1285136, at *11 (Tex. App.—Beaumont Mar. 27, 2014, pet. denied) (mem. op.)). In addition, Rule 703 allows opinions based upon inadmissible evidence if the evidence is of a sort reasonably relied upon by experts in the field in forming their opinion. *Leonard v. State*, 385 S.W.3d 570, 577 (Tex. Crim. App. 2012); *see* TEX. R. EVID. 703. Thus, when an expert relies upon hearsay in forming his opinion, and that hearsay evidence is of a type reasonably relied upon by such experts, the jury is generally permitted to hear it. *In re Commitment of Talley*, 522 S.W.3d at 748; *see also In re Commitment of Carr*, No. 09-14-00156-CV, 2015 WL 1611949, at *1 (Tex. App.—Beaumont Apr. 9, 2015, no pet.) (mem. op.); *In re Commitment of Salazar*, No. 09-07-345-CV, 2008 WL 4998273, at *4 (Tex. App.—Beaumont Nov. 26, 2008, pet. denied) (mem. op.). Even if underlying facts or data are otherwise subject to disclosure to the jury, such evidence should be excluded if the probative value in helping the jury evaluate the opinion is outweighed by its prejudicial effect. TEX. R. EVID. 705(d). Rule 705(d) provides for the use of a limiting instruction by the court to ensure that otherwise inadmissible evidence is not improperly used by the jury. *See id*.; *see also Salazar*, 2008 WL 4998273, at *4.

**B.     Error Analysis**

Dr. Turner testified that, after reviewing the travel card, he concluded Hull was convicted of rape when he was fifteen years old. Dr. Mauro described the travel card as

"a summary written by a prison employee about what the inmate's criminal history is" and stated that the travel card contained no details regarding Hull's juvenile sexual offense. Dr. Turner clarified that "there was really a very limited amount of information on that offense . . . we don't know a lot in terms of details there." There was no testimony regarding who prepared the travel card, when it was prepared, whether the travel card was kept in the regular course of business, and there was no other evidence substantiating the notation that Hull was convicted of rape when he was fifteen.

We conclude that, under these circumstances, Dr. Turner's reliance on the travel card was not reasonable, and therefore the information derived from the travel card should not have been disclosed to the jury as facts or data underlying Dr. Turner's opinion.[5] *See Leonard*, 385 S.W.3d at 573 (holding that an expert's reliance on polygraph results was not reasonable and therefore the evidence could not by disclosed to the factfinder through expert testimony); *see also E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 563 (Tex. 1995) (Cornyn, J. dissent) ("Rule 703 requires that if an expert intends to base an opinion solely on hearsay evidence, that it must be of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."). Although Dr. Turner testified that he relied on documents that are usually relied upon by experts in his field, he did not specifically state that experts in his field rely on travel cards for their analysis whether a person has a behavioral abnormality. Thus, under these circumstances, we conclude the trial court abused its discretion by admitting it. *See Leonard*, 385 S.W.3d at 573.

---

[5] We also note that the Texas Rules of Evidence generally prohibit the use of juvenile adjudications as impeachment evidence. TEX. R. EVID. 609(d).

19

**C.    Harm Analysis**

Finding error, we must now perform a harm analysis by reviewing all of the evidence to determine if the error probably caused the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1); *U-Haul Int'l, Inc.*, 380 S.W.3d at 132.  We focus our harm analysis on the effect of the evidentiary error as it pertains to the jury's implicit finding that Hull suffered from a behavioral abnormality, while keeping in mind the constitutional implications of indefinite civil commitment.

**1.    References to Juvenile Offense**

The State first referenced the juvenile offense in its opening statement, describing "a sexual offense that [Hull] committed while he was a juvenile."   Dr. Turner referenced the juvenile offense extensively as illustrated by the following excerpts from his testimony:

> Q.    And if we're looking at this case, big picture, what are your main reasons for finding that Mr. Hull suffers from a behavioral abnormality?
>
> A.    Well, the definition of a behavioral abnormality, in a paraphrased sense, is:  Does he have a condition that makes him likely to re-offend?  And when we look at Mr. Hull's life, his first offense is—occurs at the age of 15.  That was a sexual offense.  He was punished[.]
>
> . . . .
>
> Q.    Dr. Turner, if you can recall, you were giving your big picture, main reasons for finding that Mr. Hull suffers from a behavioral abnormality.
>
> A.    Sure.  And in the course of my testimony—and there's lots of science and stats and everything; but it boils down to:  Is there a condition that makes him likely to re-offend sexually?  And when you look at his life, the sexual offending began at about age 15.  He was punished.
>
> . . . .

20

Q. And so, I think you touched on this in your big picture, main reasons for finding that he has a behavioral abnormality; but going just kind of in chronological order to flush this out more, what was the first offense that you are aware of that Mr. Hull was accused of committing that is a sexual offense?

A. So, the first assault—or the first offense in the records is a rape that occurred when he was 15 years old of another 15-year-old female.

Q. Okay. And even though you indicated that there was limited amount of information regarding that, did you still take it into consideration in this case?

A. Yes. . . . [I]t was another sexual offense; and according to records, it was the reason he was sent to a state school, Gatesville, for a period of time. So, what we know is that at an early age he was willing to violate someone else to satisfy his own sexual urges. He was punished for that and then went on to re-offend, actually multiple times. So, it's quite relevant.

. . . .

Q. Do you find anything [un]usual about that, about Mr. Hull stating that he cannot remember why he was in this facility for nine months?

A. Yes. . . . Well, you know, generally things like[] that in life we tend to remember. I don't think he doesn't remember. I think he was there for the rape, as the records indicate. I think he didn't want to admit that. That's what I think.

Q. And so, what, if anything, is significant about Mr. Hull committing the sexual offense as a juvenile?

A. Well, to commit a sexual offense as a juvenile and then to go on to offend as an adult is more evidence of sexual deviance. It's more evidence of antisociality, and it increases the person's overall risk.

. . . .

Q. And I guess—even if you were to set this juvenile offense aside and only look at the convictions for the sexual offenses that he got while he was an adult, would you still find him to have a behavioral abnormality?

A. Yes, I would.

. . . .

Q.     And with regard to poor behavioral controls, you scored Mr. Hull a 2[6] on that item; is that right?

A.     Yes.

Q.     And can you explain to the jury what evidence you found of that?

A.     Well, we have evidence in his childhood, a lot of street fights and things like[] that that he talked about to me. He was suspended from school multiple times. He was sen[t] to the State school for— possibly for what we think is for the rape of a 15-year-old girl.

. . . .

Q.     And today, do you believe that Mr. Hull is a menace to the health and safety of another person?

A.     Yes, I do. . . . I think he still has sexual deviant interests. I think he's still quite antisocial; and I think, essentially, his entire life all he's done is commit sex offenses, be punished and commit more sex offenses.

During Hull's direct examination, Dr. Mauro explained that she placed little emphasis on the allegations in the travel card because she did not believe it was reliable. On cross-examination, the State pressed Dr. Mauro on the significance of the juvenile offense in relation to her conclusion that Hull was not a sexually violent predator as defined by the SVP Act:

Q.     Okay. Would you consider Mr. Hull an average sex offender?

A.     According to the stat[ist]ics and his risk, yes, I believe that he is no different than the average sex offender.

Q.     Okay. Even though he raped for the first time when he was 15 years old?

A.     Well, we don't really have the details on that. I considered that some type of sexual offense happened in his juvenile history, but I don't know the details of that.

---

[6] Dr. Turner explained that in scoring various traits, that a zero means the trait is not present, a one means that it may be present, and a two means that the subject clearly exhibits the trait.

22

. . . .

Q. And even though he recidivated after committing the offense at 15 years old, he still went on, after being punished, to commit the aggravated kidnapping? That still makes him average?

A. Well, again, we don't have the records on that juvenile history. I considered worst case scenario, that he did commit a sex offense as a teenager and that he was convicted for purposes of assessing his risk; but I can't say that he certainly did that and then certainly recidivated. So, the best I can say is that he—I considered that possibility.

. . . .

Q. You also mentioned that sometimes if someone, maybe, acts out criminally or does things they shouldn't have been doing, as a way of survival, a survival mechanism?

A. Yes.

Q. And is raping a 15-year-old girl when you are 15, is that a survival mechanism?

. . . .

A. No. If somebody did that, no.

. . . .

Q. And if a person sexually offends as a juvenile and continues to sexually offend as an adult, would that raise their risk to re-offend?

A. Yes.

The State continued to emphasize the juvenile offense in its closing argument:

He started as young as 15 years old when he had his first rape, when he raped a girl his similar age[.] . . . Like I told you, after getting caught and punished the first time, when he was 15, he went on to re-offend sexually[.] . . . Think about it. Mr. Hull committed a rape at the age of 15. He got punished. What did he do? He moved on. He kidnapped a woman, tried to rape her. Punished. What did he do? He went on to offend against two little girls[.]

23

## 2.    Analysis

The parties' respective trial strategies tasked the jury with considering whether Hull belonged to that small group of sexually violent predators contemplated by the Legislature or whether he was an "average" sex offender as proposed by Dr. Mauro.  To prove that Hull fell into the former group, the State relied extensively on Hull's alleged juvenile offense, the sexual assault of a fifteen-year-old girl.  The offense also formed the foundation for Dr. Turner's opinion that Hull suffered from a behavioral abnormality.

As reflected above, Dr. Turner cited the offense as the first indication that Hull was likely to commit future sexually violent acts.  Dr. Turner continued to reference the offense throughout his testimony to support his contention that Hull committed sexually violent offenses throughout his life, even after facing punishment.  Specifically, Dr. Turner noted that the juvenile offense was evidence of sexual deviance and "antisociality" and that it increased Hull's overall risk to reoffend.  He maintained that the offense was "quite relevant" to his determination that Hull suffered from a behavioral abnormality, and he found it unusual that Hull would deny committing the offense.

Dr. Turner also relied on the juvenile offense when scoring the degree to which Hull could be considered a psychopath, a key part of Dr. Turner's overall risk assessment. Particularly, Dr. Turner referenced the juvenile offense as justification for his score regarding "poor behavioral controls."  Finally, in concluding that Hull was a menace to the health and safety of others, Dr. Turner stressed that "his entire life all he's done is commit sex offenses[.]"  The State continued this theme in its closing argument, citing the juvenile offense three times to support its position that Hull committed sexual offenses throughout his life.

24

We note that Dr. Turner maintained that his opinion would not have changed even were he to "set aside" Hull's juvenile offense. However, this assertion is incongruous with his belief that the offense was "quite relevant" to his opinion. The offense was baked into Dr. Turner's scoring of various risk factors and informed Dr. Turner's belief that Hull exhibited a lifetime pattern of sexually violent acts. Viewing the entirety of Dr. Turner's testimony, it is clear that the juvenile offense was critically important to his opinion that Hull suffered from a behavioral abnormality.

We also consider the fact that Hull presented contrary expert testimony. Dr. Mauro did not diagnose Hull as having antisocial personality or pedophilic disorder, and she placed very little weight on the travel card, believing it to be unreliable. Dr. Mauro concluded that Hull did not suffer from a behavioral abnormality or any other condition that would make him likely to commit a future act of sexual violence. Rather, she concluded that Hull fell into the class of "average" sex offenders. It is reasonable to presume that the State's repeated emphasis on the improperly admitted evidence was calculated to overcome a contrary expert opinion. *See id.*

In assessing the relative strengths and weaknesses of the case, it is also important to note that the two expert witnesses were diametrically opposed on their opinion of whether Hull suffered from a behavioral abnormality. The jury was therefore tasked with determining which expert reached the right conclusion. In such a situation, the repeated references to Hull having allegedly raped a fifteen-year-old girl must have necessarily impacted the jury's reconciliation of the conflicting testimony.

The information derived from the travel card was a focal point of the State's case and central in its efforts to persuade the jury that Hull was more than the "dangerous but

25

typical recidivist" who is more properly dealt with through the criminal justice system. *Crane*, 534 U.S. at 413. In reviewing the entire case, considering the evidence as a whole, the strength or weakness of the case, and the verdict, we conclude that the erroneous admission of evidence probably led to the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1; *Waldrip*, 380 S.W.3d at 136. Therefore, we sustain Hull's third issue.[7]

## V. CONCLUSION

We reverse the trial court's judgment and remand the case for a new trial.

LETICIA HINOJOSA
Justice

Dissenting Memorandum Opinion by Justice Benavides.

Delivered and filed the
18th day of July, 2019.

---

[7] Our resolution of this issue is dispositive. Therefore, we do not address Hull's remaining issues. *See* TEX. R. APP. P. 47.1.

26